UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


SILVER RIDGE HOMEOWNERS'
ASSOCIATION, INC., an Oregon nonprofit
corporation,

                Plaintiff,

    v.

STATE FARM FIRE AND CASUALTY
COMPANY, an Illinois company,

                Defendant.

Case No. 3:19-cv-01218-YY

OPINION AND ORDER

YOU, Magistrate Judge.

      Plaintiff Silver Ridge Homeowners' Association ("Silver Ridge") is a nonprofit

corporation that maintains twenty-two buildings containing sixty-four residential units in

Portland, Oregon.  Compl. ¶¶ 1, 3, ECF 1-1; *see also* Mot. Summ. J., Ex. 32 at 3, ECF 17-37.

Plaintiff alleges a single claim for breach of contract against its insurer, defendant State Farm

Fire and Casualty ("State Farm") for failure to pay for "property damage."  *Id.* ¶ 14.  This court

has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of

citizenship between the parties and the amount in controversy exceeds $75,000.  *Id.* ¶¶ 1-2, 4, 11.

      Defendant has filed a Motion for Summary Judgment (ECF 17).  For the reasons that

follow, defendant's motion is GRANTED.

# I.    Legal Standards and Relevant Law

## A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324 (citing FED. R. CIV. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial."  *Balint v. Carson City, Nev*., 180 F.3d 1047, 1054 (9th Cir. 1999).  "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party."  *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000).

## B.    Relevant Law on the Interpretation of Insurance Policies

A federal court, sitting in diversity jurisdiction, applies state law to interpret an insurance policy.  *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co*., 546 F.3d 1142, 1145 (9th Cir. 2008).  Under Oregon law, "[t]he overriding goal in construing an insurance policy is to 'ascertain the intention of the parties.'"  *Hunters Ridge Condo. Ass'n v. Sherwood Crossing*, LLC, 285 Or. App. 416, 422 (2017) (citation omitted).  The court determines "the intention of the parties by analyzing the policy's express terms and conditions."  *Id*. (citing *Hoffman Const*.

*Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992), and O.R.S. 742.016(1) (providing that, with some exceptions, "every contract of insurance shall be construed according to the terms and conditions of the policy")). The court interprets the terms of the policy from the perspective of an "ordinary purchaser of insurance." *Id.* (quoting *Congdon v. Berg*, 256 Or. App. 73, 87 (2013)) (quotation marks omitted). "The language used in a contract of insurance is entitled to a construction as favorable to the insured as in good conscience will be permitted, and every reasonable intendment will be allowed to support a view that will protect the insured and prevent forfeiture." *Schweigert v. Beneficial Standard Life Ins. Co.*, 204 Or. 294, 301 (1955) (citations omitted).

If an insurance policy explicitly defines a phrase, the court must apply that definition. *Holloway v. Republic Indemn. Co. of America*, 341 Or. 642, 650 (2006). "If the policy does not define the phrase in question, [the court] 'resort[s] to various aids of interpretation to discern the parties' intended meaning." *Id.* (quoting *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 307-08 (1999)). "Under that interpretive framework, [the court] first consider[s] whether the phrase in question has a plain meaning, i.e., whether it 'is susceptible to only one plausible interpretation.'" *Id.* (quoting *Groshong*, 329 Or. at 308). "If the phrase in question has a plain meaning, [the court] will apply that meaning and conduct no further analysis." *Id.* "If the phrase in question has more than one plausible interpretation, [the court] will proceed to the second interpretive aid"—"[t]hat is, [the court] examine[s] the phrase in light of 'the particular context in which that [phrase] is used in the policy and the broader context of the policy as a whole.'" *Id.* (quoting *Hoffman Const.*, 313 Or. at 470) (alteration in original).

"If the ambiguity remains after the court has engaged in those analytical exercises, then 'any reasonable doubt as to the intended meaning of such [a] term[ ] will be resolved against the

insurance company. . . .'" *North Pacific Ins. Co. v. Hamilton*, 332 Or. 20, 25 (2001) (quoting, among other cases, *Hoffman Const.*, 313 Or. at 470 (alteration in original)); *see also Allen v. Cont'l Cas. Co.*, 280 Or. 631, 633 (1977) ("[I]n the event of an ambiguity in the terms of an insurance policy any reasonable doubt will be resolved against the insurance company and in favor of extending coverage to the insured."). "[A] term is ambiguous . . . *only* if two or more plausible interpretations of that term withstand scrutiny, i.e., continue[ ] to be reasonable. . . ." *Hoffman Const.*, 313 Or. at 470 (emphasis in original).

Exclusions are interpreted like any other terms in the policy. *Bighorn Logging Corp. v. Truck Ins. Exch.*, 295 Or. App. 819, 828-89 (2019). Generally, the insured bears the initial burden of proving coverage, the insurer has the burden of proving exclusions to coverage, and the insured has the burden of proving exceptions to exclusions. *Employers Ins. of Wausau, A Mut. Co. v. Tektronix, Inc*., 211 Or. App. 485, 509, 514 (2007) (reasoning the party seeking the benefit of a particular provision generally bears the burden of proving its application).

## II.    Suit Limitations Provision

Defendant first contends that plaintiff's lawsuit is untimely due to the suit-limitation provision found within plaintiff's insurance policy, FP-6109.[1]  Mot. Summ. J. 14, ECF 17.  The suit-limitation provision requires that legal action be "brought within two years after the date on which the accidental direct physical loss occurred."  Onken Decl. 82, ECF 17-3.  In an earlier ruling, this court found that the term "occurred" was ambiguous, and recognized that plaintiff's interpretation—that the suit limitation provision does not begin to run until a loss is discovered or exposed—was cognizable. *See* Opinion and Order 4-9, ECF 16.  Defendant now alleges,

---

[1] As relevant here, Silver Ridge was insured by defendant under the FP-6109 policy from 1995 until October 2009.  Mot. 3-4, ECF 17.

based on evidence obtained through discovery, that plaintiff "discovered the damage occurring at its complex by 2012 at the latest."  Mot. Summ. J. 15, ECF 17 (quotation removed).

### A.    Relevant Law on Statute of Limitations and the Discovery Rule

Oregon courts have adopted the "discovery rule" to determine the appropriate limitations period within a suit-limitations clause.  This rule provides that the limitations period is tolled until a policy holder, in exercising reasonable care, discovered or should have discovered injury or loss that is covered by the pertinent policy.  *Greene v. Legacy Emanuel Hosp. & Health Care Ctr.*, 335 Or. 115, 120 (2002).  Put differently, the limitations period begins to run when the insured knows or, "in the exercise of reasonable care, should know every fact which it would be necessary . . . to prove . . . to support his right to judgment."  *Stevens v. Bispham*, 316 Or. 221, 227 (1993) (citation omitted).

To be clear, the discovery rule does not require the insured to have "actual knowledge that each element is present" for the limitations period to begin.  *Gaston v. Parsons*, 318 Or. 247, 256 (1994).  However, "a mere suspicion is insufficient to begin the statute of limitations to run."  *Id.*  Between those two extremes is a "quantum of awareness" that is guided by "an objective test" inquiring "what a plaintiff should have known in the exercise of reasonable care."  *Id.*  Importantly, the "discovery rule does not protect those who sleep on their rights, but only those who, in exercising the diligence expected of a reasonable person, are unaware that they have suffered legally cognizable harm."  *Id.*

The question of "whether the injury or loss has been discovered or should have been discovered" is a question of fact.  *Ass'n of Unit Owners of Marina Riverhouse v. State Farm Fire & Cas. Co.*, No. 3:11-CV-307-MO, 2011 WL 4544630 (D. Or. Sept. 29, 2011).  It can be

resolved "against the plaintiff on summary judgment only if the plaintiff should have achieved that awareness as a matter of law." *Id*.

B.    **Background Facts**

After reviewing all the submitted exhibits, the court finds it prudent to outline the various incidents, damage, and associated repairs, that occurred at Silver Ridge between its construction in the mid-1990s and 2018, when plaintiff claims it actually discovered the damage. In doing so, the court categorizes the record in five groups: siding-related damage that occurred prior to 2012, roof-related damage that occurred prior to 2012, window-related damage that occurred prior to 2012, all assessed damage between 2012 and 2018, and finally, damage that was assessed after 2018. Of course, the various exterior features of an individual townhouse do not operate in isolation; for example, improper flashing on the roof of a unit could force water to pool and eventually penetrate a sheet of improperly attached siding, causing dry rot. However, this method of presenting the information helps illustrate what plaintiff knew as each incident occurred and whether its responses were reasonable.

1.    **Siding-Related Damage (Pre-2012)**

The first siding-related issue occurred in 1997, when a "preliminary inspection" of four Silver Ridge buildings revealed some areas where "siding is deteriorated or lacking in workmanship." Mot. Summ. J., Ex. 3 at 3, ECF 17-8. However, the architect concluded that "the siding problems are minimal and the workmanship in general is good." *Id.* Importantly, the architect included the caveats that his inspection was only visual and that "deterioration in the siding, dry rot in the framing of exterior walls[,] and other deficiencies . . . may exist which are not visually obvious." *Id.* at 1. A year later, in 1998, plaintiff authorized exterior repairs for one

of the four inspected buildings.  *Id.*, Ex. 4 at 1, ECF 17-9.  While plaintiff did not provide a

reason for the repairs, the work included "replacement of the L-P siding."  *Id.*

      In 1999, plaintiff received a memorandum, prepared by its legal counsel, evaluating the

feasibility of litigation against a construction company involved in building the townhomes.  *Id.*,

Ex. 8 at 1, ECF 17-13.  The memorandum detailed numerous construction defects across the

complex, including issues with exterior siding, but noted many issues had already been rectified.

*See id.* at 3 (describing successful fixes such as installing a slope to promote water drainage and

creating gaps to allow for water evaporation).  The memorandum also stated that "siding was

improperly affixed to the building in several places," creating "areas for moisture penetration

during wind driven rain."  *Id.*  The exhibits provide no indication this problem had been rectified.

*Id.*  However, a year later, in 2000, plaintiff informed all residents that it had selected a

contractor to undertake a re-siding project for all buildings.  *Id.*, Ex. 12 at 1, ECF 17-17.  The

association did note it was still choosing the specific siding material for installation (debating

between an eight-inch product and a five-inch product), but anticipated beginning the project no

later than July 2000.  *Id.* at 1-2.

      Between 2001 and 2012, there were a limited number of siding-related incidents.  An

invoice from 2002 detailed expenses of around $1,000 for building overhang repairs, dry rot, and

painting supplies.  *Id.*, Ex. 15 at 1, ECF 17-20.  A maintenance log noted that in 2007, the siding

of an exterior wall, presumably at a single townhouse, was removed and replaced at a cost of

over $2,300.  *Id.*, Ex. 23 at 1, ECF 17-28.  Meeting minutes from 2004 appear to confirm the

limited number of siding-related issues, as the synthetic siding was "examined and determined to

have been installed correctly," although some additional edge sealing was needed "as a

preventative" measure to prevent "premature failure."  *Id.*, Ex. 20 at 3-4, ECF 17-25.

2.    **Roof-Related Damage (Pre-2012)**

The parties' exhibits also detail numerous incidents involving roofs of Silver Ridge

townhomes.  The first of these incidents occurred in 1995, when a resident complained of "three

spots" of leakage in his roof and demanded that "the roof should be fixed" instead of temporary

repairs.  Mot. Summ. J., Ex. 1 at 1, ECF 17-6.  The same year, a professional roofing company

found unsecured skylight domes and "sections of upper roof" that lacked tiles, allowing "water

to run behind fascia [wood] and [] cause dry rot in [the] future."  *Id.*, Ex. 2 at 1, ECF 17-7.

Notably, the scope of the company's findings was not provided; whether the assessment applied

to just one building or multiple townhomes is unknown.  *See generally id.*  Three years later, in

1998, plaintiff authorized exterior repairs for one of the buildings; the scope of improvements

included "installation of flashing" and "building trim detail."  *Id.*, Ex. 4 at 1, ECF 17-9.

During 1998 and 1999, four units developed roof-related problems.  A maintenance

report from 1998 described "three possible leaks" on the roof of an unoccupied unit.  *Id.*, Ex. 5 at

1, ECF 17-10.  A separate report prepared in the same year described a leak in the garage of a

unit; during repairs, a maintenance worker noted that a roof tile was missing.  *Id.*, Ex. 6 at 1,

ECF 17-11.  Another report, created in 1999, detailed work to patch some holes on the roof of a

home.  *Id.*, Ex. 9 at 1, ECF 17-14.  A fourth report, written in the same year, reported that the

roof of another unit had broken tile and a clogged valley that prevented water from draining

properly.  *Id.*, Ex. 11 at 1, ECF 17-16.  All four incidents involved different units, and in two

cases, the worker described their fix as a "temporary" repair.  *See id.*, Ex. 5 at 1, ECF 17-10; *id.*,

Ex. 11 at 1, ECF 17-16.

Roof-related maintenance continued in the following years.  Two invoices from 2002

detailed expenses for roof leak repairs.  *See id*., Ex. 13 at 1, ECF 17-18; *id.*, Ex. 14 at 1, ECF 17-

19.  In 2005, a maintenance report detailed a leaking roof in a unit; fixes revealed further damage, including a roof that "felt deteriorated" and caused sheeting to sag.  *Id.*, Ex. 21 at 1, ECF 17-26.  That same year, another maintenance report described mold in the crawl space of a storage room; the worker again noted that the roof "felt deteriorated" and lacked sheeting in some areas.  *Id.*, Ex. 22 at 1-2, ECF 17-27.  And in 2006, a third maintenance report detailed roof sheeting that was "badly rotted"; the repair for this unit was only a "[t]emporary fix."  *Id.*, Ex. 25 at 1, ECF 17-30.

Finally, a maintenance log notes that in 2010, plaintiff approved the replacement of roof tiles and valley flashing on all buildings for a cost of $43,970.  *Id.*, Ex. 23 at 1, ECF 17-28.  Meeting minutes from 2012 indicate that "90 roof tiles were replaced in 2011."  *Id.*, Ex. 29 at 1, ECF 17-34.  The same meeting minutes also describe three roof-related issues that occurred within the past year: a request for bids to "to correct the roof drainage system and siding" of a unit, a different unit with a leaking skylight (repair was the owner's responsibility), and a "construction flaw of a minor nature" on the roof of a third unit that required no action.  *Id.*

### 3.  Window-Related Damage (Pre-2012)

Lastly, the parties' exhibits illustrate multiple issues related to windows.  The memorandum that Silver Ridge received from legal counsel in 1999 detailed "dry rot in several places around the window frames" due to problems such as over-caulking, improperly installed vapor barriers, and use of faulty materials such as spliced plywood.  Mot. Summ. J., Ex. 8 at 4, ECF 17-13.  However, the memorandum also noted that the problems were already corrected— for example, vapor barriers were re-installed in their proper locations, while flashing was added to window frames to limit the effects of poor caulking.  *Id.*  A maintenance report from the same year also detailed "some flashing repairs" in a unit, as well as caulking applied to two front

windows "because they were leaking really bad on the inside of the unit." *Id.*, Ex. 9 at 1, ECF 17-14.

It is unclear if window problems persisted between 2000 and 2002. However, in 2003, an architect was hired to investigate and make recommendations "regarding water intrusion around windows." *Id.*, Ex. 17 at 1, ECF 17-22. The architect ultimately performed a "general survey of the Silver Ridge building windows . . . not an intensive up close review of each window but a general walk by visual" and found dry rot in the windows of twenty-seven units. *Id.*, Ex. 18 at 1, ECF 17-23; *id.*, Ex. 19 at 1, ECF 17-24. A December 2003 newsletter informed residents that dry rot and water intrusion work had "been put on hold" to determine appropriate strategies to correct problems, and indicated that work would "start again, weather permitting, in Spring 2004." Meeting minutes from January 2004 detailed that a water intrusion expert had found the "window frames were incorrectly installed which means that water continues to drain inward rather than out of the frame . . . and caulking is only a temporary fix . . . The frames must really be replaced." *Id.*, Ex. 20, ECF 17-25.

Finally, in 2006, a maintenance report detailed the replacement of window trim at a unit. *Id.*, Ex. 24 at 1, ECF 17-29. However, the maintenance worker reported that removing the trim "revealed improper window installation of no side wall felt . . . Until felt is lapped correctly onto and behind window fins, trim replacement will not make window water tight." *Id.* The worker also noted that he was advised to wait for board approval before attempting any fixes. *Id.*

### 4.    First Morrison Hershfield Report (2012)

In 2012, plaintiff retained Morrison Hershfield ("MH") "to conduct a building envelope condition assessment" of two buildings "for the areas where composite wood shingle panels have been installed." Mot. Summ. J., Ex. 31 at 1, ECF 17-36. The report, delivered to plaintiff in

August 2012, detailed numerous problems with the exterior wall assemblies (including siding), windows, and roofs.  *Id.* at 2-4.  For example, MH consultants observed that the "siding and trim materials are not treated, nor are they naturally resistant to decay" and that the "weather-restrictive barrier was not properly secured and was observed to be discontinuous, torn, missing, and/or improperly lapped."  *Id.* at 2-3.  Regarding the problems with windows, the consultants advised that "the wood trims around the perimeters of the windows have been installed tightly . . . prevent[ing] proper formation of dynamic sealant joints" and that "no self-adhered membrane had been installed . . . leaving a clear path for water to enter the wall cavity at these locations." *Id.* at 4.  Finally, MH consultants noted that "50% [of] the roofing underlayment or membrane flashing were not extending up the wall [properly] . . . [t]hese areas are very susceptible to water infiltration and can allow excessive amounts of water [to] get past or go under the rooftiles, causing premature deterioration."  *Id.*

In response to the MH report, plaintiff sought bids and eventually selected Innovation Construction, a construction company, to remove and replace the wood shingle paneling at all of the townhomes.  Pl. Supp. Br. 3, ECF 24.  The work, which included "repairing decay as it was discovered," commenced in 2012 at a cost of nearly $500,000 to plaintiff.  *Id.*; *see also* Guse Decl., Ex. 2, ECF 24-3.

### 5. Second Morrison Hershfield Report (2018)

In 2018, presumably after Innovation Construction's renovations were completed, plaintiff again retained MH to perform another building envelope condition assessment of their property.  Mot. Summ. J., Ex. 32 at 3, ECF 17-37.  After an initial visit, MH consultants made nine subsequent trips to the property to "document the existing conditions and mitigate ongoing leaks."  *Id.*  MH's report, produced on April 14, 2020, indicated continued issues with the

exterior walls and roof.  Specifically, MH consultants discovered that "when Silver Ridge replaced siding" in 2012, the original "building paper and foam backer board were not removed or replaced.  New siding was placed over the top of existing building paper and foam board." Bryan Costa Decl. ¶ 5, ECF 24-8; *see also* Mot. Summ. J., Ex. 32 at 4, ECF 17-3 (noting that "[t]he shingle areas were previously an LP shingle siding, however, the LP siding was found to be a defective product and was replaced with new siding and weather resistive-barrier, but was installed over the existing exterior foam board and sheathing.").  MH consultants also concluded that while "roof tiles were observed to be largely in good working condition," "water was observed to be traveling down the roof sheathing and framing and into the wood framing exterior wall."  Mot. Summ. J., Ex. 32 at 4, ECF 17-3.  Plaintiff alleges it was at this point when it discovered the full nature of the damage to the Silver Ridge townhomes.

### C.    Analysis

Defendant primarily argues that plaintiff was, at latest, provided with "actual knowledge" of the damage at Silver Ridge in 2012 through MH's first report.  Def. Supp. Br. 2, ECF 25. Plaintiff counters that summary judgment based on the suit-limitations provision is improper because its expert, Bryan Costa, declared that the "systemic property damage" he discovered was "hidden from the owners" and "not reasonably discoverable . . . until I performed the investigative openings" in 2018.[2]

Even without Costa's expert opinion, the court can reach a similar conclusion by looking at the submitted exhibits.  The evidence demonstrates that for the most part, plaintiff acted quickly and comprehensively upon learning of damage at their townhomes.  For example, the exhibits detail a number of roof-related problems since the mid-1990s.  In 1995, a professional

---

[2] This declaration is the subject of defendant's Motion to Strike, which is addressed later.

roofing company found that at least some buildings had "sections of upper roof" that lacked tiles, likely causing "dry rot in [the] future" if left untreated.  Mot. Summ. J., Ex. 2 at 1, ECF 17-7. Four of the sixty-four units required roof-related maintenance in 1998 and 1999.  *Id.*, Ex. 5 at 1, ECF 17-10; *id.*, Ex. 6 at 1, ECF 17-11; *id.*, Ex. 9 at 1, ECF 17-14; *id.*, Ex. 11 at 1, ECF 17-16. Between 2005 and 2006, three additional maintenance reports described roofs that "felt deteriorated" or were "badly rotted."  *Id.*, Ex. 21 at 1, ECF 17-26; *id.*, Ex. 22 at 1-2, ECF 17-27; *id.*, Ex. 25 at 1, ECF 17-30.  And MH's 2012 report warned that certain portions of some roofs were "very susceptible to water infiltration and can allow excessive amounts of water [to] get past or go under the rooftiles, causing premature deterioration."  *Id.*, Ex. 31 at 1, ECF 17-36.

However, the record also shows that in most cases, repair work for roof issues was prompt.  Nearly all the individual roof issues described in maintenance reports were repaired with either temporary or long-term fixes by professionals.  *See Id.*, Ex. 5 at 1, ECF 17-10; *id.*, Ex. 6 at 1, ECF 17-11; *id.*, Ex. 9 at 1, ECF 17-14; *id.*, Ex. 11 at 1, ECF 17-16; *id.*, Ex. 21 at 1, ECF 17-26; *id.*, Ex. 22 at 1-2, ECF 17-27; *id.*, Ex. 25 at 1, ECF 17-30.  Plaintiff also authorized roof-related exterior repairs for one of the buildings in 1998, paid for roof-related maintenance in 2002, and authorized the replacement of all roof tiles and valley flashing in 2010.  *See id.*, Ex. 4 at 1, ECF 17-9; *id.*, Ex. 13 at 1, ECF 17-18; *id.*, Ex. 14 at 1, ECF 17-19; *id.*, Ex. 23 at 1, ECF 17-28.  And in fairness to plaintiff, eight individual roof-related issues over roughly seventeen years (prior to 2012) across sixty-four units does not necessarily serve as an impetus or actual knowledge of a problem, particularly if, as it appears, those issues were immediately and professionally repaired.

Plaintiff's response to the roof issues identified in MH's 2012 report was similarly comprehensive.  While the purpose of the 2012 inspection was to "assess[] exterior cladding

assemblies," MH consultants also observed roofs that were was "very susceptible to water infiltration" and would likely suffer "premature deterioration." *Id.*, Ex. 31 at 1, 4, ECF 17-36. In response, plaintiff hired a construction company that not only repaired the primary siding issues, but also addressed issues of roof decay. *See, e.g.*, Guse Decl., Ex. 3-5, ECF 24-4-6 (detailing expenses for fixes in individual units that included "replacing decayed underlayment to stop roof leak," installing "drip flashing under roof felt to stop water [from] getting behind fascia," and "removing and replacing roof sheathing").

A similar trend is evident regarding plaintiff's response to window-related issues. In 1999, plaintiff received a legal memorandum that detailed window installation issues, but it also noted that the identified problems had already been fixed. Mot. Summ. J., Ex. 8 at 1-4, ECF 17-13. In fall 2003, an architect hired to perform a survey of windows found dry rot in twenty-seven out of sixty-four units—a rate of over 42%. *Id.*, Ex. 18 at 1, ECF 17-23. A resident newsletter from December of that same year informed residents that plaintiff was working to determine how best prevent dry rot problems from reoccurring and that maintenance work would restart in the spring of 2004.[3] *Id.*, Ex. 19 at 1, ECF 17-24. And after the window-related conclusions in MH's 2012 report, plaintiff ensured that the professionals it hired to replace siding also fixed decayed and "damaged wall sheathing and framing materials." *Id.*, Ex. 31 at 29, ECF 17-36; *see also* Guse Decl., Ex. 3-5, ECF 24-4-5 (detailing fixes such as "replacing window trim" and "fix[ing] window leak" in various units).

---

[3] Plaintiff's commitment to studying how to prevent dry rot problems in windows was reinforced by a presentation at its January 2004 meeting. The minutes reflect that plaintiff had a "water instruction expert" look at the property; the expert identified problems with the installation of the frames and recommended that the frames be replaced to prevent future problems. Mot. Summ. J., Ex. 20 at 3, ECF 17-25.

Lastly, the exhibits demonstrate plaintiff's commitment to immediately rectifying siding issues with comprehensive solutions. For example, in 2000, a year after being presented with a legal memorandum detailing siding issues, plaintiff announced a project to install new siding material along all of its units. Mot. Summ. H., Ex. 8 at 1, ECF 17-13; *id.*, Ex. 12 at 1, ECF 17-17. Maintenance logs and meeting minutes from the 2000s detail continued expenses and inspections of the siding material to ensure its longevity. *Id.*, Ex. 15 at 1, ECF 17-20; *id.*, Ex. 20 at 3-4, ECF 17-25; *id.*, Ex. 23 at 1, ECF 17-28. And after being presented with MH's 2012 report, plaintiff worked quickly to rectify the siding issues, re-siding all the homes with a new material at a cost of nearly half-a-million dollars. Pl. Supp. Br. 3, ECF 24; *see also* Mot. Summ. J., Ex. 2 at 2, ECF 24-3.

The court engages in this comprehensive analysis to answer a key question: did plaintiff fail to exercise reasonable care in response to the roof, siding, and window-related problems such that it should have been aware of a larger, more serious problem? As the non-moving party, plaintiff is entitled to have all reasonable inferences drawn in its favor, and using that standard, the court cannot summarily conclude that plaintiff's actions necessarily place it at fault for its failure to discover a larger issue. Instead, the question of whether plaintiff's actions demonstrated reasonable care, in the context of the suit-limitations provision, is one for a jury.

Defendant disputes this conclusion with three interconnected arguments. First, it argues that by 2012, plaintiff had "actual knowledge" of "some" damage to the buildings, and thus, questions of whether its actions were reasonable are irrelevant. Def. Supp. Br. 2, ECF 25. However, the "discovery rule does not protect those who sleep on their rights, but only those who, in exercising the diligence expected of a reasonable person, are unaware that they have suffered legally cognizable harm." *Gaston*, 318 Or. at 256. Here, plaintiff did not sleep on its

rights; it actively worked to identify and rectify problems as soon as they arose. The court thus cannot summarily conclude that plaintiff's actions were necessarily unreasonable.[4]

Second, in attempting to demonstrate that plaintiff had actual knowledge of the full scope of the problems, defendant likens the instant case to that of *Riverview Condo. Ass'n v. Cypress Ventures, Inc*., 266 Or. App. 574 (2014), *partially abrogated on other grounds, Willms v. AmeriTitle, Inc*., 314 Or. App. 687, 703 (2021). In discussing whether the plaintiff knew or should have known of siding problems at the properties, the *Riverview Condo.* court wrote:

> By that point, the Association was aware of the following facts: that, as discussed at a condominium association meeting in early 2003, unit owners and board members were having "problems with leaking windows" in the units; that the contractor hired to repair the leaks, Himango Siding, believed the leaks were caused because of improper installation by the "original siders," so that water was entering and running down the walls and into the windows; that similar leaks were reported in other units between 2004 and 2006; that the contractors hired to repair those leaks similarly reported that the interface between the siding was done incorrectly and that the flashing was funneling water in problematic ways; that three out of the five units managed by Gordon Properties were leaking, and that they "have leaked for as long as we have managed them, which is all the way back to when the first tenants moved in"; that one of the previously repaired units was continuing to experience water leaking from windows, and that the fire alarm in unit 4C had been set off by "water coming through the alarm unit from 4D"; that the owner of one of the units had requested "a building inspector and contractor to take care of this problem"; that Sherman Rake, hired in 2005 to address leaks, had found that water had been trapped by the belly band—i.e., where the panel siding transitions to lap siding; that Sherman Rake had raised "[c]oncerns that water could be coming from areas other than around the windows" and could result in "on-going water damage"; that additional leaks were discovered in 2006 or 2007; that, by that time, at least nine of the 17 units had experienced window-related issues; and that neighboring townhomes, which were likewise developed by Cypress Ventures and built by Brookfield, were having their siding and windows replaced because of problems with leaking.

---

[4] Moreover, defendant's characterization of plaintiff having "some knowledge" is not definitive evidence of "actual knowledge" of the full scope of harm. To be sure, the discovery rule does not require the insured to have "actual knowledge that each element is present." *Gaston v. Parsons*, 318 Or. 247, 256 (1994). However, "a mere suspicion is insufficient to begin the statute of limitations to run." *Id*. Between those two extremes lies a "quantum of awareness" that is guided by "an objective test" inquiring "what a plaintiff should have known in the exercise of reasonable care." *Id*. Plaintiff's situation is squarely within that quantum.

> Given those undisputed facts, the only conclusion that a reasonable jury could reach is that, by 2006 or 2007 at the very latest, the Association knew or should have known that there was a substantial possibility that there were pervasive problems with the way that the original siding had been installed, that those problems had continually caused significant water intrusion into more than half the condominium units over a six- or seven-year span, and that further investigation of the scope of the problem was warranted.

*Id.* at 606–07.

The facts in that case are quite different from this one. Prior to 2012, plaintiff primarily experienced a handful of individual unit issues related to problems with siding, roofing, and windows. When confronted with more wide-ranging issues, such as problems with the siding of the building, or having over forty-percent of windows with dry rot, plaintiff took swift action to hire professionals to fix the problem and explored preventative measures to limit the possibility of future harm.

Finally, defendant alleges, without citation to any legal authority, that plaintiff's "piece-meal siding repairs [] performed after receiving MH's 2012 report" do not negate any prior awareness of the damage. Def. Supp. Br. 6, ECF 25. As an initial matter, defendant's characterization of plaintiff's repairs as "piece-meal" is inaccurate, considering that plaintiff spent close to half-a-million dollars to have the buildings re-sided and paid the construction company additional money to rectify any discovered issues of roof and window decay. Moreover, it is reasonable for a homeowner or homeowner's association, such as plaintiff, to rely on the judgment of professionals and follow their direction or suggestions on how to rectify a problem. Plaintiff did so here.

Defendant, as the movant for summary judgment, bears the burden of demonstrating "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(a). At a minimum, there remains a genuine dispute of fact

as to whether plaintiff's actions were necessarily unreasonable in response to problems at the property such that it must have been aware of a larger problem.  Thus, summary judgment in favor of the defendant through the suit-limitations provision is improper.

## III.    Efficient Proximate Cause and Exclusions to Coverage

Plaintiff claims the townhomes suffered "weather damage," which it argues is a covered loss.  Under an all-risks policy such as FP-6109, rain and wind-driven rain are covered perils. *See Great Am. All. Ins. Co. v. Sir Columbia Knoll Assocs. Ltd. P'ship*, 484 F. Supp. 3d 946, 965 (D. Or. 2020) (finding rain is a covered peril); *Sunbreaker Condo. Ass'n*, 79 Wash. App. at 378 (same).

Defendant asserts the following exclusions in the FP-6109 policy preclude coverage:

(1) "smog, wear, tear, rust, corrosion, fungus, mold, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself" (Onken Decl. 71, ECF 17-3);[5]

(2) "settling, cracking, shrinking, bulging, or expansion" (*id.*);

(3) "continuous or repeated seepage or leakage of water that occurs over a period of time" (*id.* at 72);[6]

---

[5] This "smog, wear, and tear" exclusion was amended in 2002 by a "Fungus (Including Mold) Exclusion Endorsement."  After 2002, this exclusion read as follows:
> (d): "smog, wear, tear, rust, corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself."

Onken Decl. 111, ECF 17-3.

[6] This "smog, wear, and tear" exclusion was amended in 2002 by a "Fungus (Including Mold) Exclusion Endorsement."  After 2002, this exclusion read as follows:
> (k): "repeated discharge or continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of time."

Onken Decl. 111, ECF 17-3.

(4) faulty, inadequate, unsound, or defective design, specifications, workmanship,

repair, construction, renovation, remodeling, grading, compaction; materials used

in repair, construction, renovation, or remodeling; or maintenance (*id.*); and

(5) "growth, proliferation, spread or presence of fungus" (*id.* at 111). [7]

Mot. 11-14, ECF 17.

Plaintiff contends that the efficient proximate cause doctrine precludes summary

judgment as to the FP-6109 policy. The Oregon Supreme Court has explained the doctrine

as follows:

> It is an established rule of insurance law that where a peril specifically insured
> against sets other causes in motion which, in an unbroken sequence and
> connection between the act and final loss, produces the result for which
> recovery is sought, the insured peril is regarded as the proximate cause of the
> entire loss.

*Gowans v. Nw. Pac. Indem. Co.*, 260 Or. 618, 621 (1971) (citing 5 Appleman, *Insurance*

*Law and Practice* § 3083 at 309 (1970); *see also Naumes, Inc. v. Landmark Ins. Co.*, 119 Or.

App. 79, 82 (1993) ("The 'efficient proximate cause' of a loss 'is the active and efficient cause

that sets in motion a train of events which bring about a result without the intervention of any

force, starting and working actively and efficiently from a new and independent source.'").

"If there are multiple causes of a single loss, the 'efficient proximate cause' is the

relevant cause for determining coverage under an insurance contract." *Naumes*, 119 Or. App. at

82. In other words, "if there are multiple causes of a loss and a covered peril is the efficient

proximate cause, then even though another cause is an excluded cause of the loss/damage, the

---

[7] This "fungus" exclusion was added in 2002 via a "Fungus (Including Mold) Exclusion
Endorsement." In other words, this exact exclusion was not part of plaintiff's coverage policy
prior to 2002, although other portions of the pre-2002 policy could be read to provide similar
coverage. *See, e.g.*, Onken Decl. at 71, ECF 17-3 (excluding coverage for fungus, mold, decay,
and deterioration).

loss/damage is nonetheless covered." *12W RPO, LLC v. Affiliated FM Ins. Co.*, 353 F. Supp. 3d

1039, 1047–48 (D. Or. 2018) (citing *Naumes*, 119 Or. App. at 82). "In contrast, if the proximate

efficient cause is an excluded peril, the loss is not covered." *Id.* at 1048 (citation omitted).

Importantly, if both theories efficient proximate cause are excluded under the policy, then no

relief is available to the insured. *See Fourth St. Place v. Travelers Indem. Co.*, 127 Nev. 957,

970 (2011), *as modified on reh'g* (May 23, 2012).

Although defendant has identified five possible exclusions within the FP-6109 policy,

each party has presented its own central theory of damage: plaintiff alleges that it is weather

conditions, while defendant alleges it is construction defects. *See* Resp. 8-11, ECF 18; Reply 14-

15, ECF 21. Each theory is examined in turn below.

### A.    Construction Defects Theory

Defendant asserts that the efficient proximate cause of the damage was construction

defects. Reply 14-15, ECF 21. FP-6109 excludes coverage for damage from construction

defects and inadequate construction:

> (3) We do not insure under any coverage for any loss consisting of one or more of
> the items below. Further, we do not insure for loss described in paragraphs 1. and
> 2. immediately above regardless of whether one or more of the following: (a)
> directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before,
> at the same time, or after the loss or any other cause of the loss:
> …
> > (b) faulty, inadequate, unsound or defective:
> > …
> > (2) design, specifications, workmanship, repair, construction, renovation,
> > remodeling, grading, compaction;
> > (3) materials used in repair, construction, renovation or remodeling; or
> > (4) maintenance.

Onken Decl. 72, ECF 17-3.

Defendant has proffered evidence suggesting that the efficient proximate cause of the

damage was, indeed, defective construction. Its expert, Tim Lewis, explains that at the time the

townhomes were built, "[t]he buildings originally were clad in defective LP siding . . . [a]s

originally constructed, the windows were installed without proper flashing or other

waterproofing measures."  Lewis Decl. 2, ECF 17-1.  Lewis also notes issues with improperly

installed roofing tiles and faulty repairs, both of which led to repeated penetration of water

during Portland's frequent rainfall.  *Id.* at 2-3.

Plaintiff does not dispute the existence of construction-related defects at the townhomes.[8]

Instead, it contends the efficient proximate cause is something else—"weather conditions"—and

argues that as a matter of law, construction defects can *never* serve as the efficient proximate

cause of damage.  Plaintiff's argument rests on three points, all related to text from the Oregon

Supreme Court's decision in *Gowans*: first, that construction defects do not "set in motion" rain;

second, that construction defects did not independently cause damage at the townhomes; and

third, that the construction defects cannot cause damage without rain.  Mot. 8-11, ECF 18; *see

also* 260 Or. at 621.

However, as plaintiff concedes, its position is contrary to that of "[c]ourts in Oregon and

Washington."  Mot. 9, ECF 19.  Indeed, at least one case in this district holds that construction

defects can serve as the efficient proximate cause of building damage.  *Point Triumph

Condominium Ass'n v. American Guarantee and Liability Insurance Co.* involved a group of

condominium buildings near the Oregon coast which suffered water penetration-related damage.

No. 99-1504-JE, 2000 WL 34474454, at *1 (D. Or. Dec. 29, 2000).  The plaintiff, who was the

owner of these buildings, sought a claim against the insurer, arguing the property was damaged

---

[8] Indeed, plaintiff's own maintenance records confirm that the buildings suffered from
construction defects.  For example, a litigation memorandum from plaintiff's counsel describes
its work as an "evaluation of the feasibility of pursuing a claim for damages . . . arising from
*construction defects* at Silver Ridge."  Mot. Summ. J., Ex. 8 at 1, ECF 17-13 (emphasis added).

by weather.  The insurer denied the claim, arguing that defective siding, construction, and

maintenance were the culprits for the plaintiff's loss; plaintiff then sued the insurer in this court.

*Id.* at *2, *5.  This court, interpreting two Ninth Circuit cases, found that construction-related

defects could serve as the efficient proximate cause:

> Plaintiff's loss here was caused by moisture penetrating the siding and
> substructure of several of plaintiff's buildings. Wind-driven rain, a peril covered
> by the policy, is a common phenomenon on the Oregon Coast, and there is no
> evidence in the record that it would have damaged plaintiff's buildings in the
> absence of defects in material or inadequacies in construction or maintenance that
> are specifically excluded under the policy. The damage to plaintiff's buildings was
> not a "natural" direct or indirect consequence of the rain, but instead was an
> abnormal occurrence that would not occur in the absence of other conditions—the
> faulty material, construction, or maintenance established by the record—that were
> specifically excluded from coverage under the policy. Under these circumstances,
> as in *Smith* and *Tento*, rain may have "operated more immediately" than other
> factors in producing the loss. Like the failure to cover exposed property in those
> actions, use of defective siding, or improper construction or maintenance here "set
> in motion" the chain of events leading to the loss. Here, as in those decisions, the
> rain cannot be characterized as the "dominant" or "most important" cause of loss.
> Accordingly, a trier of fact could not conclude that wind-driven rain constituted
> the efficient proximate cause.

*Id.* at *6 (D. Or. Dec. 29, 2000).  In addition to this finding, the *Point Triumph* court cautioned

against using language from *Gowans*—as plaintiff does now—to argue that only weather

conditions, and not construction defects, can serve as the efficient proximate cause:

> Though [*Gowans*] sets out an important principle of insurance law, the Court's
> application of that principle to the facts before it does not support plaintiff's
> position here. In determining that a reward paid by the insured to secure the return
> of stolen jewelry constituted a "loss by theft" within the meaning of a policy, the
> Court noted that the reward was a "natural and direct consequence of the theft,"
> and characterized the theft as the "dominant cause of the loss" that the insured
> incurred in paying the reward. *Id. Gowans* does not support the conclusion that
> wind-driven rain can be characterized as the "efficient proximate cause" of
> plaintiff's loss here.

*Id.*

This court is persuaded by the analysis in *Point Triumph*, and adopts it here. Plaintiff's argument—that construction defects cannot serve as the efficient proximate cause of the damage here—is rejected. If a jury found that the efficient proximate cause of the damage at the Silver Ridge buildings stemmed from construction defects, then the applicable coverage exclusion would apply, and defendant would prevail.

### B.    Weather Conditions Theory

Meanwhile, plaintiff asserts that the efficient proximate cause of the damage is "weather conditions" and that the peril is covered under FE-6109. Reply 8, ECF 18. In support of this theory, plaintiff points to the declaration of its expert, Bryan Costa, who opines:

> It is my professional opinion that the efficient or predominant cause of damage at Silver Ridge was due to weather conditions, including wind-driven rain. If these buildings had not been exposed to weather, the property damage I discovered would not have occurred.

Costa Decl. ¶ 4, ECF 18-4. At the outset, it is important to clarify an important point: while plaintiff's expert opines that the efficient proximate cause of the damage is weather conditions, he only describes damage from *water*-related weather conditions, such as wind-driven rain. *Id.* In other words, Costa does not opine that weather events that are independent of water, such as intense heat, caused the damage. Moreover, plaintiff's maintenance records themselves suggest that the only weather condition involved is *rain* or *wind-driven rain*. *See, e.g.*, Mot. Summ. J., Ex. 8 at 3, ECF 17-13 (describing moisture penetration from "wind driven rain"); *id.*, Ex. 32 at 5, ECF 17-37 (concluding that MH's consultants, including Costa, "found there to be systemic water damage throughout the community as a result of wind-driven rain"). Accordingly, the

court treats plaintiff's efficient proximate cause of "weather conditions" as synonymous with

water-related weather conditions.[9]

Defendant responds by arguing that even if the efficient proximate cause of the damage is

water-based weather conditions, such as wind-driven rain, FP-6109 excludes coverage for such

damage through the "seepage or leakage of water" exclusion or the "dry rot" exclusion.  Reply

14, ECF 21.

> The original "seepage or leakage of water" exclusion read:
>
> (2) We do not insure for loss either consisting of, or directly and immediately
> caused by, one or more of the following:
> …
> k. continuous or repeated seepage or leakage of water that occurs over a period of
> time.

*See* Onken Decl. 71-72, ECF 17-3.  The exclusion was then amended in 2002 (through the

adoption of FE-6566, a fungi-related addendum) to read:

> k. repeated discharge or continuous or repeated seepage or leakage of water, or
> the presence or condensation of humidity, moisture or vapor, that occurs over a
> period of time.

*Id*. at 111.  Defendant argues that these terms clearly convey to an ordinary person that water

damage, including wind-driven rain, is excluded from coverage.

---

[9] Defendant has challenged the overall credibility of Costa's declaration in a motion to strike, which is addressed later in this opinion.  Relevant to this point, though, defendant alleges that "[i]n conflict with plaintiff's prior position, plaintiff and its expert would now have the Court believe that the damage to its development was due to weather conditions and not rain."  Mot. Summ. J. 2-8, ECF 17.  While the court acknowledges some of the points defendant makes—for example, that plaintiff initially alleged that the efficient proximate cause was "wind-driven rain" before changing it to "weather conditions"—defendant's description of Costa's inconsistency is inaccurate.  Costa does not declare that "weather conditions" excludes wind-driven rain; if anything, his declaration states that weather conditions *include* wind-driven rain.  Costa Decl. ¶ 4, ECF 18-4.

Plaintiff responds with several arguments. First, it notes that defendant created an exclusion for weather conditions in future policies, and claims that the absence of such an exclusion in the FP-6109 policy indicates that weather conditions were not originally excluded. Opp. 12, ECF 18. While this argument may be rhetorically appealing, it is not dispositive; this court must still conduct an actual examination of the text of the applicable policy, FP-6109. And, as discussed in this opinion, the "seepage or leakage of water" exclusion in FP-6109 bars coverage for the damage for which plaintiff seeks recovery.

Second, plaintiff alleges:

> Insurance policies are interpreted from the perspective of an average purchaser of insurance. . . . The fact that insurance attorneys and the Court, in this case and in *Abitare*, have spent numerous pages and hours of argument discussing whether the application of the seepage or leakage exclusion applies to weather conditions is proof enough that an average purchaser of insurance could not come to the conclusion suggested by State Farm.

*Id.* at 12. In making this argument, plaintiff invokes litigation in a similar case before this court, *Abitare Condo. Ass'n. v. State Farm Fire & Cas.*, No. 3:18-CV-01074-YY, 2021 WL 7081392 (D. Or. 2021). In *Abitare*, the court contemplated arguments surrounding the interpretation of an insurance policy identical to the one in this case. There, the plaintiff noted that the term "water" appeared in different contexts throughout the insurance policy, and suggested that an ordinary purchaser of insurance would be confused at the alleged inconsistencies in the context of rain damage. *Id*. at *7. In interpreting the policy, the court made two observations: first, that examples of forms of water included in the policy did not purport to be definitional clauses that confined the meaning of water; and second, that the use of "water" in the exclusion was not inconsistent with rain. *Id.* at *6-*7. The court then concluded:

> These two points illuminate an important principle: "water" has a consistent meaning within FP-6109, and that meaning is its ordinary and commonly understood forms: rain falling from the sky, rain that has hit the ground and

become surface water, water from leaking equipment, water that crashes onto beaches and so forth. Defendant's decision to provide examples of what the exclusion applies to does not subsequently bind the meaning of water to *only* those examples, and an ordinary person would not interpret the water exclusion to imply as such. There is no confusion as to the meaning of "water" within FP-6109, and ambiguity cannot be created by presenting illustrative examples as ironclad limitations.

*Id.* at *8. Thus, while plaintiff may claim that the voluminous briefing in *Abitare* speaks volumes about how State Farm's policies are allegedly confounding, the court disagreed, finding one consistent meaning accessible to an ordinary purchaser of insurance.

Third, plaintiff argues that the "continuous" and "repeated" terms in the seepage or leakage exclusion make no sense in the context of rain. Opp. 19, ECF 18. However, that argument is inconsistent with the findings of other courts, which have concluded that such an exclusion applies in the context of water-related weather conditions, including rain. For example, in *Iroquois on the Beach, Inc. v. Gen. Star Indem. Co*., a Michigan hotel suffered damage "gradually over the course of several years" due to "water . . . entering the building envelope because of the insufficient steel frame that failed to protect the building in windy conditions, inappropriateness of the existing cladding system for the site's extreme climatic conditions, and the too high or sloped existing grade around the building." 550 F.3d 585, 586 (6th Cir. 2008). Before addressing the application of the efficient proximate cause doctrine, the Sixth Circuit panel acknowledged that the seepage exclusion applied to water and rain. *Id*. at 588.

Similarly, *Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of New York* involved an insurance dispute over damage to a condominium development in connection with Hurricane Ivan. 600 F. Supp. 2d 1228 (S.D. Ala. 2009). The policy contained an exclusion for "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of

humidity, moisture or vapor, that occurs over a period of 14 days or more," as well as an

exclusion for "hidden or latent defects." *Id.* The court concluded that proximate cause was a

jury question because there were factual disputes whether the damage was caused by

construction defects, or "whether [the plaintiff's] claimed loss arises from those continuous,

repeated seepages of water over time, or from the one-time event of Hurricane Ivan driving

sheets of rain through the Building's windows and doors." *Id.* These cases illustrate that courts

routinely apply a "continuous or repeated seepage or leakage of water" exclusion toward damage

from rainwater.

Thus, the "continuous or repeated seepage or leakage" exclusion applies to plaintiff's

theory of efficient proximate cause theory: water-based weather conditions. The only remaining

question is whether the water seeped or leaked for a requisite period of time. While the term

"period of time" is undefined in the policy, the court in *Fifth v. State Farm Ins*. Co. found:

> The plain meaning of "period" is "a length of time during which a series of events
> or an action takes place or is completed." The plain meaning of "time" is "the
> thing that is measured as seconds, minutes, hours, days, years, etc."

No. CIV.A. 11-7440 NLH, 2014 WL 1253542, at *5 (D.N.J. Mar. 25, 2014). The court held that

the time period at issue—one month—"would fit the description." *Id.* Here, evidence from

plaintiff's own expert concludes that water damage at Silver Ridge "has been affecting the

community for over ten (10) years." *See* Mot. Summ. J., Ex. 32 at 5, ECF 17-37. A period of

ten years certainly falls within the meaning of a "period of time" in the policy.

Plaintiff also alleges there exist internal inconsistencies within the policy's dry rot

exclusion, and argues such inconsistencies illustrate that defendant's "policy is rife with

ambiguities and inconsistencies." Opp. 22, ECF 18. Specifically, plaintiff points to the

exclusion for smog, wear, and tear. That exclusion, in its original form, reads as follows:

(2) We do not insure for loss either consisting of, or directly and immediately caused by, one or more of the following:
…
d. smog , wear, tear, rust, corrosion, fungus, mold, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

But if accidental direct physical loss by any of the "Specified Causes of Loss" or by building glass breakage results, we will pay for that resulting loss.

*See* Onken Decl. 71, ECF 17-3.  Plaintiff then identifies the following clauses within the policy's

"Specified Causes of Loss":

Each time the phrase "Specified Causes of Loss" is used in this policy, it refers to all of the following causes :
…
14. water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

*Id.* at 67.  Lastly, plaintiff presents the declaration of its expert, who states:

The 2019 Oregon Structural Specialty Code defines the Exterior Wall Envelope as a "system."

In my professional opinion, I would couch any water damage as being a "discharge," as opposed to "continued or repeated seepage or leakage" over time. It is my opinion that discharge more accurately describes the outlet of water at Silver Ridge.

Costa Decl. ¶ 7, ECF 18-4.  Plaintiff stiches these three points together to argue that the water

damage at the townhomes, by virtue of being "discharge[d]" from a "system," falls within an

exception to the "smog, wear, and tear" exclusion and is thus covered—a result that would make

no sense if the court concluded that the water damage was not covered due to the seepage or

leakage exclusion.[10]  Opp. 14-15, ECF 18.

[10] Plaintiff points to two other sections that highlight this alleged contradiction.  First, it notes that the seepage or leakage exclusion applies if it occurs "over a period of time"—a phrase that, according to plaintiff, "can be any measurement of time, no matter how small."  Opp. 16, ECF 18.  Plaintiff alleges that any seepage or leakage of water from its wall "system" would thus be

Plaintiff's argument, while certainly creative, has been rejected by other courts.  In

*Matthews v. Harleysville Ins. Co.*, a Sixth Circuit panel faced a similar argument, and wrote:

> The following caveat does apply, however: "If an excluded cause of loss
> [including those that fall within the Wear and Tear Exclusion] results in a
> 'specified cause of loss' or building glass breakage, [Harleysville] will pay for the
> loss or damage caused by that 'specified cause of loss' or building glass
> breakage." . . . The only plausible option among these is "water damage," which
> the Policy defines as "accidental discharge or leakage of water or steam as the
> direct result of the breaking apart or cracking of any part of a system or appliance
> (other than a sump system including its related equipment and parts) containing
> water or steam."  Using that definition, the water damage to the building here
> does not qualify as a "specified cause of loss" under this exception to the Wear
> and Tear Exclusion because a roof is plainly not a "system or appliance."

826 F. App'x 508, 515 (6th Cir. 2020).  Although the policy does not offer a definition for the

term, the dictionary definition of a "system" is "a group of devices or artificial objects or an

organization forming a network especially for distributing something or serving a common

purpose, [i.e.] a telephone system, a heating system, a highway system, a computer system."

*System*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/system (last visited

February 27, 2022).  Accordingly, this court, like the Sixth Circuit panel, concludes that the term

"system" within the exclusion does not apply to damage sustained to roofs or siding, and rejects

plaintiff's argument that such a clause creates confusion that renders the exclusion moot.

"[I]f the proximate efficient cause is an excluded peril, the loss is not covered."  *12W

RPO, LLC v. Affiliated FM Ins. Co.*, 353 F. Supp. 3d 1039, 1048 (D. Or. 2018).  Here, both

theories of efficient proximate cause are subject to the policy's exclusions.  If defendant is

---

excluded from coverage under the seepage or leakage exclusion, but included in coverage as part
of the "smog, wear, and tear" exclusion.  *Id.*  Second, plaintiff adds that the terms "seepage,"
"leakage," and "discharge" are undefined, creating a "rabbit hole" for any purchaser of insurance
to understand.  *Id.*  Both issues are resolved in the same way as the first concern: there is no
contradiction between the two clauses because a siding system "is plainly not a system or
appliance."  *Matthews v. Harleysville Ins. Co.*, 826 F. App'x 508, 515 (6th Cir. 2020) (internal
quotation removed).

correct, and the efficient proximate cause of the damage at Silver Ridge is construction defects, then the construction defects exclusion in plaintiff's policy applies to exclude coverage. Similarly, if plaintiff is correct, and the efficient proximate cause of the damage is water-related weather conditions, then the "seepage or leakage" exclusion applies and denies plaintiff coverage. Defendant is thus entitled to summary judgment.[11]

## IV.    Defendant's Motion to Strike

In its reply, defendant moved to strike both declarations submitted by plaintiff's expert, Costa. Reply 2-8, ECF 21; *see also* Costa Decl., ECF 12-4 (first declaration), Costa Decl., ECF 18-4 (second declaration). Defendant argues that Costa's respective declarations (1) offer expert testimony in the form of legal conclusions, which are inadmissible; (2) contradict plaintiff's sworn responses to defendant's interrogatory questions, and (3) amount to a "sham affidavit" to avoid summary judgment. *See* Reply 2-8, ECF 21. Plaintiff opposes defendant's motion on both its timeliness and on the merits. Opp. Mot. Strike 1-8, ECF 22.

In any event, there was no need for the court to rely on either of Costa's declarations to decide the motion for summary judgment. Accordingly, this motion is moot.

---

[11] This conclusion regarding efficient proximate cause differs from that of *Abitare* in two key respects. First, the parties in *Abitare* submitted competing expert declarations as to whether the property in question was properly constructed, creating an issue of fact that prevented summary application of the construction defects coverage exclusion. *Abitare*, 2021 WL 7081392 at *5-*6. In this case, plaintiff has only alleged that it is not possible, as a matter of law, for construction defects to ever serve as the efficient proximate cause. Second, there was no evidence in the *Abitare* record as to the duration of the water seepage or leakage while one of the insurance policies was in effect. *Id.* at *10. There is evidence of such in the record here.

30 – OPINION AND ORDER

**ORDER**

Defendant's motion for summary judgment (ECF 17) is GRANTED and this case is

dismissed with prejudice.

DATED March 15, 2022.


_____/s/ Youlee Yim You_____
Youlee Yim You
United States Magistrate Judge